UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DEBORAH FULLER, ADMINISTRATRIX
OF THE ESTATE OF MATTHEW FULLER                                    PLAINTIFF

vs.                                              CIVIL ACTION NO. 3:17-CV-661-CRS

CORRECT CARE SOLUTIONS, LLC, et al.                                DEFENDANTS

<u>MEMORANDUM OPINION</u>

Before the Court are two motions for summary judgment, one filed by Defendant Robert Rozefort, M.D. ("Dr. Rozefort"), and the other filed by Defendants Correct Care Solutions, LLC ("CCS") and Kimberly Brown, LPN.  DNs 64, 70.  Plaintiff Deborah Fuller, administratrix of the estate of Matthew Fuller ("Fuller"), filed a combined response in opposition.  DN 76.[1]  Dr. Rozefort and the CCS Defendants replied.  DNs 79, 80.  The matter is now ripe for review.

For the reasons stated herein, both motions for summary judgment will be granted.

## I. BACKGROUND

### A. Introduction

This action arises out of medical complications and ultimately the death of Matthew Fuller while incarcerated at Louisville Metro Department of Corrections ("LMDC") in Jefferson County, KY.  Fuller was arrested and detained at LMDC on June 9, 2016.  Fuller remained in custody, having been sentenced to serve a ninety-day sentence on June 16, 2016.  DN 76-19, at PageID #

---

[1] Plaintiff did not oppose dismissal of her claims against Nurses Brenda Junk, Candi Porter, and Joyce Hill.  DN 76, at PageID # 1124 n. 1.  Accordingly, Defendants Brenda Junk, Candi Porter, and Joyce Hill are entitled to summary judgement in their favor.

1193.   While in custody Fuller's medical condition deteriorated significantly, and he was transferred to University of Louisville Hospital on June 22, 2016.   After a thirteen-day hospitalization, Matthew Fuller died on July 5, 2016.  He was twenty-five years old.  Fuller's mother, as administratrix of his estate, seeks to hold CCS and certain individual medical staff liable for his death.

### B.  Procedural History

Plaintiff filed this 42 U.S.C. § 1983 action asserting Eighth and Fourteenth Amendment claims for deliberate indifference to Fuller's serious medical needs.  Plaintiff has also asserted supplemental state law negligence and wrongful death claims against the remaining Defendants. DN 1.   This Court previously dismissed all claims asserted against co-defendants Louisville/Jefferson County Metro Government and Louisville Metro Department of Corrections Director Mark Bolton.  DN 16.

### C.  Fuller's Detention at LMDC

Unless otherwise noted, the following facts are undisputed:

*June 9, 2016.*  Matthew Fuller was arrested and brought to LMDC.  During the intake process, he disclosed to Nurse Tiffany Veit that he used heroin daily and had last injected the drug the previous day.  DN 76-3, at PageID # 1163.  Nurse Veit conducted a medical screening and recorded his vital signs: 152/91 (blood pressure), 98.2 (temperature), 97 (pulse), and 145 lbs. (weight).  DN 76-3, at PageID # 1164.  Due to Fuller's admitted drug use, he was placed on a "detox protocol" to monitor him while he began the process of heroin withdrawal.  DN 76-4, at PageID # 1168.  The protocol required that vital signs and symptoms be charted on a clinical opiate withdrawal scale ("COWS") score sheet.  DN 76-5, at PageID # 1169.

2

***June 11.***  On his third day at LMDC, Fuller was assessed by nurses three times.  *Id.*  That night it was noted that his temperature reached 100.9.  *Id.*  Notations on the COWS score sheet indicate Nurse Barbie Wood administered Tylenol ("acetaminophen") to Fuller for the fever.  *Id.*

***June 12.***  At 1:00 a.m. Nurse Wood documented that she received a verbal order from Dr. Rozefort to discontinue Fuller's withdrawal monitoring.  DN 76-7.  Plaintiff asserts that Nurse Wood discussed with Dr. Rozefort the recent entries on Fuller's COWS worksheet as well as his history of IV drug use.  DN 76, at PageID # 1128.  Nurse Wood affirmed that it was her typical practice to discuss such data with the physician before receiving a verbal order to discontinue a detox protocol, but in this instance, she does not remember the particular conversation.  DN 78-9, at PageID # 1741–44, 1746.

***June 13.***  The next morning Nurse Tiffany Veit performed a Medical History and Physical Assessment of Fuller, and documented Fuller's history of substance abuse.  DN 76-8.  Fuller's vital signs were 102.7 (temperature), 129 (pulse), and 140 lb. (weight).  *Id.*  At the time of this assessment, Nurse Veit was not aware that Fuller's detox protocol monitoring had been discontinued.  DN 78-8, at PageID # 1712–13.

***June 14.***  At 9:30 a.m. Fuller complained of a fever to licensed practical nurse (LPN) Kimberly Brown while she was passing out medications and conducting sick call.[2]  DN 78-1, at PageID # 1220–21, 1223.  Nurse Brown conducted a physical assessment of Fuller and took his temperature. She recorded a 100.5 temperature and "malaise" on CCS' "Fever Nursing Documentation Pathway" ("FNDP"), a computerized nursing tool.  DN 76-9.  The FNDP indicated that a provider should be notified "if patient has more than one episode of fever in a week."  DN 76-9, at PageID # 1117.  Nurse Brown did not have access to Fuller's medical record while conducting medication

---

[2] It is unclear from the record precisely how these encounters arise, however it is sufficient for our purposes that we simply identify when Fuller was evaluated for his complaints.

pass/sick call.  DN 78-1, at PageID # 1221.  Nurse Brown administered Tylenol 650 mg to Fuller according to the fever pathway standing order.  DN 76-9, at PageID # 1177.  At 2:10 p.m. that afternoon, Fuller's temperature was 97.6.  DN 72, at PageID# 927.  That same day, Fuller submitted a healthcare request form on which he indicated: "I have had a fever for three days.  I don't think it's detox related.  I need to see a doctor."  DN 76-10.

*June 17.*  In the morning, Nurse Brown evaluated Fuller in response to his healthcare request of June 14th.  DNs 76-10, 76-11.  Nurse Brown documented a 99.3 temperature in the FNDP.  DN 76-11.  Under the "subjective complaint" section, she marked "new onset' and "malaise."  *Id.* at 1180–81.  She administered acetaminophen 650mg under the standing order in the FNDP.  *Id.* at 1183.  There is no record indicating she notified a physician.  Later in the day, Fuller submitted another healthcare request form complaining that: "I HAVE NOT HAD A BOWEL MOVEMENT IN OVER ONE WEEK – SERIOUS PAIN."  DN 76-12.

*June 18.*  LPN Candi Porter saw Fuller in the evening in response to the June 17th healthcare request.  *Id.*  She obtained a verbal order from Dr. Rozefort for a stool softener for five days.  DN 78-5, at PageID # 1495.

*June 21.*  Around 2:45 p.m., while Nurse Brown was passing medications to inmates, Fuller indicated that he had a headache, fever, diarrhea for four or five days, and dark brown urine for five or six days.  DN 76-14, DN 78-1, at PageID # 1250.  Nurse Brown took his vital signs which were: 99/58 (blood pressure), 164 (pulse), 101 (temperature), and she documented that he was weak, had an unsteady gait, and was in distress.  DN 76-14.  She also noted Fuller had a history of detox for heroin and meth.  *Id.*  She called for Dr. Rozefort to assess Fuller in his cell.  *Id.*

Dr. Rozefort diagnosed Fuller with dehydration.  *Id.*  Dr. Rozefort explained that "it looks like his dehydration was related to the diarrhea."  DN 78-6, at PageID # 1590.  He also explained his assessment of Fuller:

> "[A]t first, he was quite stable.  And secondary that, with continuing diarrhea, he begun to develop a fever.  And when I saw him, he was still quite stable.  He just needed to be rehydrated.  He was stable in the sense that the fever was low-grade. He was responding quite well to doses of Tylenol.  He didn't look toxic in a manner to suggest that any serious thing was happening to him."

DN 78-6, at PageID # 1602.  Dr. Rozefort further testified that while he didn't suspect endocarditis, he had not ruled it out as a possibility.  DN 78-6, at PageID # 1603.  He elaborated that he did not diagnose sepsis because Fuller's "fever was responding perfectly well to every dose of Tylenol. An individual in sepsis would not be."  *Id.* at 1616.  He further stated: "I inspect an individual that running a fever for days.  His fever was responding to Tylenol every time, and he began to get dehydrated.  He needed fluid not to go into hypovolemic shock.  I prescribed for him."  *Id.* 1628. Dr. Rozefort also testified that: "I knew he was a drug addict, but I had no idea he was an IV drug addict."  *Id.* at 1629.  He stated that had he known Fuller was an IV drug addict, he would have transferred Fuller to the hospital "[w]ithout delay."  *Id.* at 1630.  He also testified:

A. I didn't check into his electronic record to see whether he was an IV drug user?

Q. Yes, sir.

A. I did not, because I trusted that whoever received him there would have made

that clear in the record.  So I thought he was a regular drug user who was having a

fever.

*Id.* at 1631.  Dr. Rozefort ordered IV fluids, transport to the medical clinic, and vital sign monitoring every four hours.  DN 76-14.

Fuller was transported by wheelchair to the medical floor.  *Id.*  At 3:40 p.m., after IV fluids were administered, Nurse Brenda Junk noted unlabored respirations and documented Fuller's vital

5

signs: 104/64 (blood pressure), 130 (pulse), 98.4 (temperature).  DN 76-15.  At 4:40 p.m., after additional IV fluids had been administered, Fuller's vital signs were: 102/58 (blood pressure), 113 (pulse).  *Id.*  At 10:30 p.m. LPN Joyce Hill took Fuller's vital signs: 98/52 (blood pressure), 140 (pulse), 100.4 (temperature).  DN 76-16.  Dr. Rozefort was not advised of any changes in Fuller's vital signs at 10:30 p.m.  DN 78-2, at PageID # 1302.

*June 22.*  At 3:00 a.m., Nurse Hill documented that Fuller's vital signs were: 104/51 (blood pressure), 140 (pulse), 100.2 (temperature).  DN 76-16.  These results were not reported to Dr. Rozefort.  DN 78-2, at PageID # 1302.

Later in the morning, Dr. Benjamin Kutnicki assessed Fuller.  DN 76-17.  Fuller's vital signs at the time of Dr. Kutnicki's assessment were: 110/48 (blood pressure), 130 (pulse), 99.6 (temperature).  DN 76-17.  Fuller reported feeling better than the day before.  *Id.*  Dr. Kutnicki noted objective findings of petechial spots on Fuller's "hand, feet and toes."  *Id.*  Dr. Kutnicki diagnosed Fuller with sepsis and ordered that he be transferred to the hospital.  *Id.*  At the University of Louisville Hospital, Fuller complained of "feeling like I'm going to die."  DN 76-18.  He was intubated for hypoxic respiratory failure and diagnosed with infective endocarditis and septic shock.  *Id.*

*July 5.*  After spending thirteen days in the hospital, efforts to save Matthew Fuller's life were futile.  Matthew Fuller died on July 5, 2016.  *Id.*

## II.  LEGAL STANDARD

A party moving for summary judgment must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be

no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.  In undertaking this analysis, the Court must view the evidence "in the light most favorable" to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 1774–75, 167 L. Ed. 2d 686 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L.Ed.2d 176 (1962)).  But "[e]vidence suggesting a mere possibility is not enough to get past the summary judgment stage." *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986).

The party moving for summary judgment bears the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  This burden can be met by "showing that the materials cited do not establish the . . . presence of a genuine dispute." FED. R. CIV. P. 56(c)(1)(B).  The burden can also be met by showing that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.  DISCUSSION

The Court will first analyze Plaintiff's §1983 deliberate indifference claims before proceeding to the state law claims.

### A.  § 1983 Deliberate Indifference to Serious Medical Need

A § 1983 claim requires a plaintiff to prove (1) the deprivation of a constitutional right "(2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)).

The constitutional right at issue in this case is an inmate's right to medical treatment. Private medical professionals providing "healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983." *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (citing *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)). Therefore, the second element of the §1983 claim is satisfied.

State governments have "a constitutional obligation to provide medical care to" detainees. *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 566 (6th Cir. 2020). This obligation is rooted in the Eighth Amendment prohibition against cruel and unusual punishment. U.S. Const. amend. VIII; *see Estelle v. Gamble*, 429 U.S. 97, 102–04, 97 S. Ct. 285, 290–91, 50 L. Ed. 2d 251 (1976). This prohibition is violated by a jail medical professional's deliberate indifference to an inmate or detainee's "serious medical needs," which "constitutes the 'unnecessary and wanton infliction of pain,'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

The Eighth Amendment deliberate indifference claim requires proof of an inmate's (1) objectively serious medical need and (2) a jail official's subjective indifference. *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 591 (6th Cir. 2021). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir.1990)) (citations omitted). The plaintiff is required "to prove that the [official] had a 'sufficiently culpable state of mind,' equivalent to criminal recklessness." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 839–40, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). This requires evidence that "the official knows of and disregards

an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Negligence "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. "Nevertheless, medical treatment may be constitutionally impermissible if it is 'so woefully inadequate as to amount to no treatment at all.'" *Richmond v. Huq*, 885 F.3d 928, 939 (6th Cir. 2018) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). As the Sixth Circuit explained, "[i]t is insufficient for a doctor caring for inmates to simply provide some treatment for the inmates' medical needs; rather, 'the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm.'" *Id.* at 940 (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)).

The Eighth Amendment "provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, but where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008) (citing *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L.Ed.2d 605 (1983)). In this case, Fuller was a pre-trial detainee at LMDC from June 9th until June 16th, 2016, when he was sentenced to serve a ninety-day sentence. Therefore, the claim for the early portion of his incarceration falls under the Fourteenth Amendment standard. Thereafter, while he remained in LMDC, the Eighth Amendment standard applies. While they are articulated differently, there is little practical difference between the two standards.

9

Under *Brawner*'s Fourteenth Amendment deliberate indifference standard, the plaintiff has the burden to prove that in response to a serious medical need, a prison official:

> "(a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [the detainee], even though a reasonable official in [the same] position would have known that the serious medical need posed an excessive risk to [the detainee's] health or safety."

14 F.4th at 597.  "Mere negligence is insufficient" to satisfy this standard.  *Id.* at 596.  Rather, the Court must determine whether the official acted "recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  *Id.* (quoting *Farmer*, 511 U.S. at 836).

Plaintiff alleges that Defendants' conduct was intentional.  *See* DN 1, at PageID # 9.  However, the record contains no evidence to support that allegation.  Defendants dispute whether Plaintiff has presented evidence from which a reasonable jury might conclude that a reckless failure to act has been proven.

### 1.  Dr. Rozefort

Dr. Rozefort argues he only provided care to Fuller on June 21st.  DN 64, at PageID # 374.  He denies rendering care on any prior dates which would render him liable for deliberate indifference.  We will address Fuller's allegations of deliberate indifference by Rozefort on June 12, 13, and 18 seriatim.

### a.  June 12

The record contains a note by Nurse Wood that Fuller's detox protocol for opiate withdrawal was discontinued at 1 a.m. on June 12, 2016, per a verbal order from Dr. Rozefort. Construing the facts in the light most favorable to the non-moving party, the Court will assume

Dr. Rozefort gave the verbal order on June 12.  This act must be shown to be reckless to state a claim under the Fourteenth Amendment.  Plaintiff has provided no evidence to establish this.  He notes only that Fuller's previous set of vital signs featured a fever of 100.9, of which Rozefort was unaware.

The plaintiff cites to Nurse Wood's testimony that detox can last seven days.  However, even if taken as true, this statement does not establish that it was reckless of Dr. Rozefort to remove Fuller from the protocol before the expiration of seven days.  Plaintiff has failed to demonstrate that Dr. Rozefort's order to discontinue withdrawal monitoring was reckless.  The deliberate indifference claim with respect to Dr. Rozefort's conduct on June 12 is without merit.

### b. June 13

On June 13th, Fuller was examined, and a Medical History & Physical was completed. Fuller's vital signs were recorded, including a temperature of 102.7.  These History & Physical reports are reviewed and signed by a physician.

Plaintiff claims that Dr. Rozefort failed to review and sign Fuller's Medical History & Physical and that this failure was an act of deliberate indifference.  However, Plaintiff offers no evidence that it was Dr. Rozefort's responsibility to review this report, when he should have reviewed it, or that he even knew of its existence.  Absent any evidence concerning Dr. Rozefort specifically, the plaintiff has failed to state a claim for deliberate indifference by Dr. Rozefort on June 13th.

### c. June 18

Plaintiff argues Dr. Rozefort was deliberately indifferent when he "fail[ed] to review Matthew's medical history and [] fail[ed] to direct that his vitals be taken and reported" when

11

Nurse Porter called him on June 18th.  DN 76, at PageID # 1148.  That day, Dr. Rozefort responded to Nurse Porter's report of Fuller's constipation complaint by giving a verbal order for a stool softener for five days.  Plaintiff alleges that this "violated CCS policy and the standard of care," but does not provide evidence of this policy.  *Id.*  The plaintiff identifies a nurse's testimony on a policy, but no evidence of a policy that directs physician practice.  *Id.* at 1132.  In any case, allegations of negligence alone will not support a claim of deliberate indifference.  Indeed, Plaintiff's expert Dr. Blondell does not include this allegation in the conduct identified in his expert report.  Plaintiff has not identified an expert opinion indicating Dr. Rozefort's acts or omissions in connection with the verbal order on this date were in any way improper.  Therefore, plaintiff has not presented evidence from which a reasonable jury could conclude that Dr. Rozefort was deliberately indifferent to Fuller's serious medical need on June 18th.

### d.  June 21 Encounter

Plaintiff argues that Dr. Rozefort's failure to transport Fuller to the hospital on June 21st was deliberately indifferent.  Plaintiff also criticizes Dr. Rozefort's failure to instruct the nurses in the medical clinic of what to watch for when monitoring Fuller's vital signs overnight after he was given fluids.  Plaintiff characterizes these failures as "inexcusable."  *Id.* at 1149.  Dr. Blondell stated:

> "The deceased was not transported to a hospital on 6/21/16 for the evaluation and treatment of an acute and urgent medical condition.  Appropriate treatment would have included the administration of intravenous fluids along with an investigation to determine the cause of the deceased's dehydration.  Instead, intravenous solutions were administered at the jail without appropriate laboratory monitoring or a diagnostic evaluation.  The treatment of acute bacterial endocarditis is a medical emergency where a few hours can make a difference in the clinical outcome.  This treatment would have involved the prolonged administration of antibiotics."

DN 50-1, at PageID # 213.

Dr. Blondell also stated, "if the standard of care required diagnostic resources beyond those available at LMDC, then transfer to a facility that does is the standard of care." DN 74-1, at PageID # 1117. Dr. Blondell additionally noted that with the initiation of IV fluids, Fuller "should, at a minimum, have had his serum electrolytes evaluated while instituting IV fluids." *Id.* He further opined that the "standard of care is to recognize and treat sepsis as soon as possible. That last missed opportunity to initiate antibiotic therapy on 6/21/2016 proved fatal to Mr. Fuller." *Id.* at 1118. While Dr. Rozefort diagnosed and treated Fuller on the 21st, Dr. Blondell urges that he would have done more and would have done it differently.

We reiterate that mere negligence does not rise to the level of a constitutional violation. Indeed "courts are generally reluctant to second guess the medical judgment of prison medical officials." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 944 (6th Cir. 2010). However, "in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (citing *Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir. 1970)).

Plaintiff cites to *LeMarbe v. Wisneski* to argue that the plaintiff need only demonstrate that Fuller's "serious medical needs were consciously disregarded." 266 F.3d 429, 439 (6th Cir. 2001). *LeMarbe* is clearly distinguishable from the case before us. In *LeMarbe*, a surgeon observed bile that had leaked into an inmate's abdomen, but when unable to determine the source of the leaked bile, the surgeon simply drained the bile and closed the incision. *Id.* at 433. The Court found that a jury could find deliberate indifference where the surgeon knew an inmate had a serious medical need that required immediate attention, but the surgeon did not take any further action. *See id.* at 438–39.

By contrast, in this case, Dr. Rozefort provided direct care to Fuller, including transferring Fuller to the medical unit, administering IV fluids, and monitoring his vital signs.  Dr. Rozefort did not disregard Fuller's serious medical need.  Rather, Dr. Rozefort determined that Fuller needed treatment for dehydration and monitoring of his vital signs to ensure the treatment was efficacious.

Dr. Rozefort testified regarding his assessment of Fuller and his plan of care on June 21, 2016.

> "[A]t first, he was quite stable.  And secondary that, with continuing diarrhea, he begun to develop a fever.  And when I saw him, he was still quite stable.  He just needed to be rehydrated.  He was stable in the sense that the fever was low-grade. He was responding quite well to doses of Tylenol.  He didn't look toxic in a manner to suggest that any serious thing was happening to him."

DN 78-6, at PageID # 1602.  Dr. Rozefort also testified "it looks like his dehydration was related to the diarrhea."  *Id.* at 1590.

Dr. Rozefort also testified that he did not suspect endocarditis when he examined Fuller because: "infective endocarditis [] occurs in very sick people, very toxic people, and people that are sick, very sick, toxic.  Their fever wouldn't be responding to Tylenol.  I'm not ruling it out.  It was a possibility.  But the evidence at that time was not leading toward that."  *Id.* at 1603. Additionally, Dr. Rozefort identified why he did not suspect sepsis in his examination of Fuller. "His fever was responding perfectly well to every dose of Tylenol.  An individual in sepsis would not be."  *Id.* at 1616.

The facts of this case differ from *LeMarbe*, because here Dr. Rozefort responded to Fuller's serious medical need with a medical assessment, plan of care, medical interventions and follow up monitoring.

Plaintiff further argues that Dr. Rozefort's failure to review Fuller's medical record or inquire into whether Fuller was an IV drug user demonstrated deliberate indifference.  DN 76, at

PageID # 1133–35.  Dr. Rozefort admitted that this information would have changed his treatment of Fuller.  DN 78-6, at PageID # 1630.  However, failing to consult a medical record or inquire into social history while actively assessing and treating an inmate does not constitute deliberate indifference.  Dr. Rozefort was providing treatment to Fuller and was not deliberately indifferent to his needs.

Plaintiff further argues that Dr. Rozefort's failure to instruct the nurses in how to respond to Fuller's vital signs overnight was deliberately indifferent.  Dr. Rozefort testified that he expected the nurses to call him and report if Fuller's vital signs did not improve.  *Id.* at 1605–06.  When asked, Dr. Blondell offered no testimony identifying Dr. Rozefort failure to properly supervise or train the nurses.  *See* DN 73-1, at PageID # 1041.  The plaintiff has offered no expert testimony to support the contention that Dr. Rozefort's treatment of Fuller on June 21st was deliberately indifferent.

Additionally, Dr. Rozefort contends that Plaintiff has failed to come forward with evidence sufficient to identify an "objectively serious medical need" required for a deliberate indifference claim.  Dr. Rozefort cites to *Smith v. Franklin County* to explain the Sixth Circuit standard.

> Allegations of denial of medical treatment based on a delay in treatment are to be gauged by examining the effect of the delay in treatment, which is to say that an "inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."

227 F. Supp. 2d 667, 677 (E.D. Ky. 2002) (quoting *Napier v. Madison County,* 238 F.3d 739 (6th Cir. 2001)).  Here, plaintiff is alleging a delay in medical care, in that the transfer which occurred on June 22nd should have happened on June 21st.

Dr. Blondell could not say that it was more probable than not that Fuller would have lived had he been transferred to the hospital on June 21st rather than the 22nd.  He stated that the "last

missed opportunity to initiate antibiotic therapy on 6/21/2016 proved fatal to Mr. Fuller." DN 74-1, at PageID # 1118.  However, Dr. Blondell ultimately concluded that he could say no more than that "on the 21st, I think this man had a chance of living." DN 64-1, at PageID # 396.  The defendant's expert disputes this.  DN 74-1, at PageID # 1118.  Although there is a dispute of fact concerning whether the delay in transfer caused a medical injury, we have concluded that any delay has not been shown to have been caused by deliberate indifference.

Summary judgement will be granted in Dr. Rozefort's favor on the §1983 claim.

### 2.  LPN Kimberly Brown

### a.  June 14 Encounter

Plaintiff contends that Nurse Brown was deliberately indifferent to Fuller's serious medical needs with regard to his complaint of fever on June 14.  This was Nurse Brown's first clinical encounter with Fuller.  She was unable to review his medical record when addressing his complaint.  She determined he had a temperature of 100.5 and administered acetaminophen per a standing order.  She did not notify a physician nor document any other vital signs in Fuller's chart.

Plaintiff has not presented evidence that Nurse Brown or a reasonable LPN in Brown's position would have perceived an excessive risk to Fuller of a 100.5 fever requiring her to notify a physician.  Brown did not know of Fuller's previous fever, and at the time of her encounter had no method of accessing his medical record.  Plaintiff's expert notes that two fevers in a week warrants notification of a physician, but Brown was not armed with that knowledge.  Further, the expert has only identified that this was a "missed opportunity" to diagnose the source of the fever, and that the medical staff's failure to refer Fuller for a clinical evaluation did not meet the standard of care.  DN 50-1, at PageID # 212–13.  However, the question under the Fourteenth Amendment

16

is whether the prison official displayed deliberate indifference by a reckless act or omission when a reasonable official would have known of a serious medical need in similar circumstances, not just whether conduct fell below the standard of care.  Plaintiff has failed to provide evidence of such recklessness on June 14th.

### b.  June 17 Encounter

Nurse Brown saw Fuller again on June 17th in response to Fuller's healthcare request stating he had had a fever for three days and requesting to see a doctor.  Nurse Brown recorded Fuller's temperature of 99.3.  She did not record any other vital signs at this visit or contact a physician, but she did administer acetaminophen to Fuller.  Plaintiff alleges that Nurse Brown violated CCS policy when she failed to contact a physician or record other vital signs.  However, "violation of an internal policy does not establish a constitutional violation."  *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 582 (6th Cir. 2020).

Dr. Blondell identifies this encounter as an "opportunit[y] to diagnose [Fuller's] underlying condition and refer for treatment."  DN 50-1, at PageID # 212.  Though Dr. Blondell identified this as an opportunity to diagnose Fuller's condition, he did not state that Brown was aware of a serious medical need, or that a reasonable LPN in Nurse Brown's position would have identified an excessive risk to Fuller under the circumstances.  And in fact, Nurse Brown did not perceive a temperature of 99.3 as an indicator of a serious risk of harm requiring further action.  When nursing staff are unaware that a prisoner "suffered from a serious medical ailment, and they instead interpreted his symptoms as indicating a different condition, for which they provided appropriate treatment, they were not deliberately indifferent to his medical needs."  *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014).  Thus, the Plaintiff has failed to come forward with evidence that Nurse Brown acted with reckless disregard for a substantial risk of harm.

Because Plaintiff has not produced evidence to support a finding of deliberate indifference to serious medical need, summary judgement will be granted in Nurse Brown's favor on the §1983 claim.

### 3. CCS

Plaintiff contends that the alleged misconduct of CCS staff "exposes CCS inexcusable failure to train its staff on not just withdrawal, but on the signs and symptoms of a potentially fatal medical condition."  DN 76, at PageID # 1136.  Plaintiff argues that the CCS policies themselves are not at issue, but instead that CCS failed "to train and supervise the persons it employs" or with whom it contracts. *Id.* at 1149.   A private entity acting under color of state law may be subject to § 1983 liability when a constitutional violation results from a policy or custom of the entity.  *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because CCS was contracted by LMDC to provide services, it will be treated as a municipality for purposes of the analysis of a failure to train claim.

A plaintiff may demonstrate a "municipal policy or custom leading to the alleged violation" by identifying "a policy of inadequate training or supervision." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015).  Plaintiff cites to *City of Canton, Ohio v. Harris* to explain the policy of inadequate training standard:

> But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."

489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989).  Plaintiff alleges that "though Rozefort had no experience or training in detox, and CCS provided him no training in detox, it nonetheless assigned him the responsibility for supervising patients in withdrawal, and gave him

the power to discontinue their monitoring." DN 76, PageID # 1149. They argue this was an assigned duty where the need for training was obvious and the lack of training was likely to result in a violation of constitutional rights.

However, in *City of Canton* the Court went on to explain that a plaintiff "must still prove that the deficiency in training actually caused the [official's] indifference to [the inmate's] medical needs." *Id.* at 391. And the plaintiff must provide evidence that "the injury would have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Id.* Additionally, proof that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." *Id.* at 390. Liability against a municipality will only result "where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Id.* at 392.

Dr. Blondell admitted that he had not formed any opinions on the policies and procedures he had reviewed. DN 64-1, at PageID # 391, 403. The plaintiff presented no expert evidence regarding CCS' supervision or training policies for employees and contractors. Thus, the alleged deficiencies in CCS' supervision policy or training program have not been identified or connected to Fuller's death. Nor has Plaintiff presented evidence of a different policy or training program which would have prevented the injury. The Sixth Circuit has found that "in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992).

Plaintiff alleges violations by the medical staff of "multiple" CCS policies, and Dr. Blondell identifies a failure to meet the standard of care, but a "violation of an internal policy does not establish a constitutional violation." *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 582

(6th Cir. 2020).  In the absence of "an underlying constitutional violation," a municipality cannot be liable under § 1983.  *Id.* at 581.

To the extent Plaintiff argues that CCS' supervision of its employees was inadequate, she has shown only the actions of its employees, and nothing about their supervision.  CCS' motion for summary judgment will be granted with respect to the §1983 claim against CCS for failure to adequately train or supervise its employees.

### B.  Remaining State Law Claims

Plaintiff also asserts state law claims against Dr. Rozefort, Nurse Brown, and CCS. However, Plaintiff's § 1983 claims served as her sole basis for federal jurisdiction.  The Court has found no constitutional violations and will grant summary judgment on the § 1983 claims.  The Sixth Circuit has held that "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."  *Winkler v. Madison Cnty.*, 893 F.3d 877, 905 (6th Cir. 2018) (quoting *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014)).

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

### IV.  CONCLUSION

Our Constitution prohibits prison officials from unnecessarily and wantonly inflicting pain on inmates and pretrial detainees by acting with deliberate indifference to their serious medical needs.

The plaintiff has failed to produce evidence to satisfy the elements of this claim against any of the remaining defendants for the reasons articulated herein.  Therefore, summary judgement is proper.

A separate order will be entered in accordance with this opinion.

September 19, 2022

Charles R. Simpson III, Senior Judge
United States District Court

21